**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

                    Plaintiff,

   v.

GENERAL SERVICES
ADMINISTRATION,

                    Defendant.

Civil Action No. 18-cv-2071-CKK

<u>**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR
SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

I.    The Government's Efforts to Build a New FBI Headquarters ........................... 2

II.   President Trump's Reported Intervention in Decision-making About the New FBI Headquarters ...................................................................................................... 3

III.  This Suit ......................................................................................................... 4

ARGUMENT ............................................................................................................... 7

I.    GSA Failed to Conduct an Adequate Search for All Responsive Records ........................ 7

  A.  The Agency Did Not Conduct the Search Agreed Upon by the Parties ............................. 7

  B.  GSA Used Unreasonably Narrow Search Terms that Failed to Locate Emails Released by House Oversight ................................................................... 10

II.   GSA Is Improperly Withholding Material under FOIA Exemptions 5 and 7(E) ............ 13

  A.  Exemption 5 ........................................................................................... 15

    1. GSA Fails to Satisfy the Foreseeable Harm Standard as to Each of its Exemption 5 Withholdings ................................................................. 16

    2. The Presidential Communications Privilege Does Not Apply to the Email Communications or the Briefing Itinerary ...................................................... 20

    3. The Deliberative Process Privilege Does Not Apply to the Email Communications or Draft Documents ........................................................ 24

    4. GSA Fails to Justify Its Application of the Attorney Work Product Privilege ................ 27

  B.  Exemption 7(E) ....................................................................................... 28

III.  GSA Fails to Demonstrate that It Released All Reasonably Segregable Non-Exempt Material ................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Am. Ctr. for Equitable Treatment, Inc. v. Office of Mgmt. & Budget*, 281 F. Supp. 3d 144
(D.D.C. 2017) ............................................................................................................... 12

*Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162 (D.D.C. 2018). ............................... 7, 10

*Am. Ctr. for Law & Justice v. U.S. Dep't of State*, 330 F. Supp. 3d 293 (D.D.C. 2018)............. 23

* *Am. Oversight v. Office of Mgmt. & Budget*, No. 18-CV-2424 (DLF), 2020 WL 1536186
(D.D.C. Mar. 31, 2020)........................................................................................ 10, 11, 12

*Arthur Andersen & Co. v. IRS*, 679 F.2d 254 (D.C. Cir. 1982).................................................... 26

*Blackwell v. FBI*, 646 F.3d 37 (D.C. Cir. 2011) .......................................................................... 28

*Boyd v. U.S. Marshals Serv.*, No. 99-2712, 2002 U.S. Dist. LEXIS 27734 (D.D.C. Mar. 15,
2002) ............................................................................................................................ 13

*Burka v. HHS*, 87 F.3d 508 (D.C. Cir. 1996)......................................................................... 13, 29

*Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336 (D.D.C. 2018) ............................................. 25

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)...................... 24, 28

*Coffey v. Bureau of Land Mgmt.*, 249 F. Supp. 3d 488 (D.D.C. 2017) ....................................... 10

*CREW v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014)........................................................................... 29

* *CREW v. GSA*, No. 18-CV-377 (CRC), 2018 WL 6605862 (D.D.C. Dec. 17, 2018)......... 10, 11

*Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16 (D.D.C. 2013)......................... 23

* *Ctr. for Investigative Reporting v. CBP*, No. 18-2901 (BAH), 2019 WL 7372663
(D.D.C. Dec. 31, 2019) ................................................................................. 14, 17, 18, 19

*Davis v. DOJ*, 460 F.3d 92 (D.C. Cir. 2006) ................................................................................. 7

*Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001) ................... 15, 27

*EPIC v. CBP*, 160 F. Supp. 3d 354 (D.D.C. 2016)....................................................................... 29

*Friends of Blackwater v. U.S. Dep't of Interior*, 391 F. Supp. 2d 115 (D.D.C. 2005) ................. 13

*Hussain v. DHS*, 674 F. Supp. 2d 260 (D.D.C. 2009) .................................................. 13

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998) .......................................................... 27

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ........................................ 20, 21, 22, 25

*In re Sealed Case*, 146 F.3d 881 (D.C. Cir. 1998) ........................................................ 28

*Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108 (D.C. Cir. 2004) ........................................ 20, 23, 24

*Judicial Watch, Inc. v. DOJ*, 432 F.3d 366 (D.C. Cir. 2005) ........................................ 27

*Judicial Watch, Inc. v. DOJ*, No. 17-0832 (CKK), 2019 WL 4644029 (D.D.C.

  Sept. 24, 2019) ................................................................................. 14

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006) .................................... 13, 24

*Judicial Watch, Inc. v. Reno*, 154 F. Supp. 2d 17 (D.D.C. 2001) .................................. 27

\* *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C.

  2019) ................................................................................. 14, 16, 17, 18, 20

*Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252 (D.D.C. 2004) ........................... 26

*King v. DOJ*, 830 F.2d 210 (D.C. Cir. 1987) .............................................................. 13

*Kubik v. BOP*, No. 10-6078-TC, 2011 WL 2619538 (D. Or. July 1, 2011) ................................. 30

*Mapother v. DOJ*, 3 F.3d 1533 (D.C. Cir. 1993) .......................................................... 24

*Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ........................... 31

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011) ........................................................... 13

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) .......................................................... 31

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002) ................................. 14

*Nat'l Sec. Archive v. CIA*, 752 F.3d 460 (D.C. Cir. 2014) ............................................... 25

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ..................................................... 24

*Oglesby v. Dep't of Army*, 920 F.2d 57 (D.C. Cir. 1990) ............................................................... 7

*Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 330 F. Supp. 3d 373 (D.D.C.

 2018) .......................................................................................................... 20, 22, 24

*Public Emps. for Envtl. Responsibility v. EPA*, 926 F. Supp. 2d 48 (D.D.C. 2013).................... 31

*Public Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865 (D.C. Cir. 2010)...................... 25

*Rashid v. DOJ*, 99-cv-2461-GK, slip op. (D.D.C. June 12, 2001) ............................................... 28

*Rosenberg v. DOD*, 342 F. Supp. 3d 62 (D.D.C. 2018) ........................................................ 14, 17

*Shapiro v. DOJ*, 969 F. Supp. 2d 18 (D.D.C. 2013) ..................................................................... 28

*Stolt-Nielsen Transp. Grp. v. United States*, 534 F.3d 72 (D.C. Cir. 2008) ................................ 15

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997)..................................................................... 15

*Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999)........ 31

*Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999) .................................. 7, 12

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ......................................................................... 13

*Weisberg v. DOJ*, 627 F.2d 365, 271 (D.C. Cir. 1980)................................................................... 7

*Weisberg v. DOJ*, 745 F.2d 1476 (D.C. Cir. 1984)................................................................... 7, 10

*Wilderness Soc. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1 (D.D.C. 2004) .............................. 26

## Legislative Materials

H.R. Rep. No. 114-391 (2015)....................................................................................................... 16

S. Rep. No. 114-4 (2015) .............................................................................................................. 14

## Statutes

5 U.S.C. § 552(a) ....................................................................................................................... 2, 14

5 U.S.C. § 552(b) .............................................................................................................. 15, 28, 31

FOIA Improvement Act, Pub. L. No. 114-185, 130 Stat. 538 (2016) .......................................... 14

**Rules**

Fed. R. Civ. P. 26(b)(3)............................................................................................................... 27

# INTRODUCTION

In this suit under the Freedom of Information Act ("FOIA"), Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks communications between Defendant General Services Administration ("GSA") and the White House concerning the renovation of the Federal Bureau of Investigation's ("FBI") headquarters.  In July 2019, this Court ordered GSA to conduct a supplemental search for responsive records, concluding that the agency's prior search was inadequate.  ECF No. 26 ("Op.") at 7–12.  GSA completed a supplemental search and produced 13 pages of records following the Court's order.  The parties now cross-move for summary judgment.

CREW is entitled to summary judgment for multiple reasons.  First, GSA's search remains inadequate, as the agency inexplicably failed to conduct the search agreed upon by the parties in a joint status report and acknowledged by the Court in its September 2019 scheduling order.  The search terms ultimately used by GSA were under-inclusive and not reasonably calculated to locate all relevant documents.  Second, all of GSA's exemption claims fail because the agency has provided insufficient detail to satisfy the "foreseeable harm" standard recently codified in the FOIA Improvement Act of 2016.  Third, GSA fails to justify its claims of deliberative process privilege, presidential communications privilege, or attorney work product privilege under Exemption 5.  Fourth, GSA's withholding of an email between the GSA Office of the Inspector General ("OIG") and GSA pursuant to Exemption 7(E) is improper, both because the agency provides insufficient details to support such a claim, and because GSA's stated desire to protect secret law enforcement "techniques" is incompatible with the fact that the GSA Inspector General, by sending the email at issue, disclosed those techniques to the very

entity and officials it is charged with investigating.  Finally, GSA has failed to demonstrate that it segregated all non-exempt material from responsive records it has withheld in full.

CREW respectfully asks the Court to rule upon GSA's exemption claims and the issue of segregability even if the Court decides GSA's search was once again inadequate.  Deferring ruling on these issues would serve only to further delay GSA's release of records responsive to CREW's July 2018 FOIA request.  Such delay has already been exacerbated by GSA's overall lack of diligence in handling this case, in which it has missed two production deadlines, disregarded clear and obvious leads in conducting searches, and inexplicably abandoned search terms the parties agreed upon—all of which has impeded CREW's statutory right to "prompt[]" release of responsive records.  *See* 5 U.S.C. § 552(a)(3).  Moreover, GSA had ample opportunity to try to correct the deficiencies identified by CREW's first motion for summary judgment but has made no attempt to do so, indicating it has no better justifications to offer.

For all these reasons, the Court should grant CREW's motion and deny GSA's motion.

## BACKGROUND

## I.    The Government's Efforts to Build a New FBI Headquarters

In 2012, GSA announced its plan to relocate the FBI's headquarters from its current location in Washington, D.C. to a more secure location in the suburbs that could house all FBI personnel in one modern facility.  CREW Ex. 2 at 2–3.  GSA's plan, for many years, was to partner with a developer that would design and construct a consolidated headquarters facility in exchange for title to the existing FBI headquarters, housed in the J. Edgar Hoover building, and its land.  *Id.* at 3.  Between 2012 and 2017, GSA made substantial progress on this project and received several proposals by interested developers.  *Id.* at 3–4.

On July 11, 2017, just months after President Trump took office, GSA suddenly cancelled the FBI headquarters consolidation project.  *Id.* at 4.  Then, on February 12, 2018,

GSA and the FBI submitted to Congress a new proposal to demolish and rebuild the FBI

headquarters at the existing site in Washington, D.C.—a drastic departure from the prior plan of

building a consolidated campus facility in a surrounding suburb.  *Id.* at 10.

The agencies' sudden change-in-course came as a surprise to many, including

Congress.  At hearings held in February and April 2018, members of Congress expressed

concern about the decision to abandon the long-pursued consolidated campus plan in favor of the

demolish-rebuild plan, and questioned GSA officials about the reasons for that decision.  *Id.*

## II.     President Trump's Reported Intervention in Decision-making About the New FBI Headquarters

In July 2018, news reports indicated that President Trump was "obsessed" with the FBI

headquarters project, had intervened in decision-making about the project, and, to that end, met

with FBI and GSA officials to discuss it.  Compl. ¶ 11 (collecting news reports).  Any

involvement by President Trump in the project would be highly problematic because the current

FBI headquarters is located across the street from the Trump International Hotel.  *See* CREW Ex.

7 at 1 (Letter from U.S. House Committee on Oversight and Government Reform ("House

Oversight") to GSA).  The President thus has a serious conflict of interest as to any decision

whether to keep the FBI headquarters at its current location or to transfer the land to a private

party, which could be a competitor of the Trump Hotel.  *Id.* at 2–3.

On August 27, 2018, GSA's Office of Inspector General released a report entitled

"Review of GSA's Revised Plan for the Federal Bureau of Investigation Headquarters

Consolidation Project" ("GSA OIG Report").  CREW Ex. 2.  The GSA OIG Report described

three in-person meetings between GSA and White House officials concerning the FBI

headquarters project, which were held on December 20, 2017, January 24, 2018, and June 15,

2018.  *Id.* at 5–6, 7–9, 11.  The latter two meetings included President Trump.  *Id.* at 7–9, 11.

The report concluded that the GSA Administrator's testimony to Congress in April 2018—which did not disclose these contacts with the White House despite repeated questioning—was "incomplete" and "may have left the misleading impression that [the Administrator] had no discussions with the President or senior White House officials in the decision-making process about the project." *Id.* at 2, 18–21.

On October 18, 2018, House Oversight publicly released several GSA emails regarding the FBI headquarters project. *See* CREW Exs. 3, 7. Among these emails were the following:

- A January 25, 2018 email exchange between Joseph Lai of the White House and Brennan Hart of GSA concerning the "path forward for the new FBI Headquarters announcement," which the "President" had "signed off on." CREW Ex. 3 at 2281.

- A January 28, 2018 email exchange in which GSA officials forwarded an email from an official with the Office of Management and Budget ("OMB"), and explained that the FBI headquarters project is now "a demolition/new construction [project] per the President's instructions." *Id.* at 2290–91.

## III.    This Suit

To help answer questions about President Trump's involvement in the FBI headquarters project, CREW submitted a FOIA request to GSA on July 30, 2018. GSA Ex. 1 [ECF No. 36-4]; Declaration of Travis Lewis ("Lewis Decl.") ¶ 4 [ECF No. 36-3]. CREW's FOIA request sought "all communications from January 20, 2017 to [July 30, 2018] between GSA and the White House concerning the renovation of the FBI headquarters." GSA Ex. 1. After GSA's statutory response deadlines elapsed, CREW filed this suit on September 4, 2018. ECF No. 1.

On October 18, 2018—the same day House Oversight released the GSA emails described above—the parties held a phone call during which GSA stated that its search uncovered no records responsive to CREW's FOIA request.  GSA Ex. 2 at 2 [ECF No. 36-5].  After CREW pointed to the emails released by House Oversight earlier that day, GSA agreed to conduct another search using specific terms and parameters provided by CREW, which were formulated based partly on language from the emails released by House Oversight.  *Id.* at 1–2.

In a series of communications from December 7, 2018 to March 15, 2019, GSA informed CREW that it had located 52 pages of responsive records and was withholding 27 of those pages pursuant to Exemption 5.  CREW Ex. 1, 4–6.  GSA produced the remaining 25 pages with redactions pursuant to Exemptions 5, 6, and 7.  CREW Ex. 1 at 2[1]; Lewis Decl. ¶ 9.

CREW and GSA then cross-moved for summary judgment.  On July 29, 2019, the Court granted in part summary judgment to CREW, holding that GSA's search was inadequate.  Op. at 12.  The Court observed that at least two emails released by House Oversight were responsive to CREW's FOIA request but had not been located by GSA—even though GSA had been aware of the emails prior to conducting its search—and found that GSA's search "was not reasonably calculated to discover all documents responsive to Plaintiff's request." *Id.* at 11–12.  The Court also held that CREW's proposal of search terms did not narrow its FOIA request, noting that the parties never agreed to the terms in a written status report filed with the Court. *Id.* at 8–9.  The Court ordered GSA to conduct an adequate search, after meeting and conferring with CREW. *Id.* at 12.  The Court denied without prejudice the parties' cross-motions with respect to GSA's exemption claims. *Id.*

---

[1] For exhibits in which the original document had no pagination, the cited page numbers refer to the PDF page numbers.

In accordance with the Court's directive, the parties met and conferred regarding GSA's supplemental search.  The parties reported to the Court on September 9, 2019 that GSA would search for "all agency communications" with specified employees within the Executive Office of the President ("EOP"), and noted that "[t]he parties agreed" GSA would use the following search terms to locate responsive documents: "FBI", "Federal Bureau of Investigation", "Hoover", "JEH", "Wray", "Rosenstein", and "Deputy AG."  ECF No. 27.[2]  The Court issued a minute order that day acknowledging the parties' agreed-upon search terms and ordering GSA to complete an initial production by September 27, 2019.  Minute Order (Sept. 9, 2019).

Production did not take place on schedule.  GSA missed the court-ordered production deadline of September 27, 2019, and—only after CREW inquired about the missed deadline—asked the Court to extend the deadline *nunc pro tunc* because the White House needed additional time to review eight documents prior to their production.  ECF Nos. 28, 29.  The Court, while recognizing a lack of diligence on the agency's part, granted GSA an extension but instructed that if the White House had not completed review by October 11, 2019, GSA "SHALL release the eight pages to Plaintiff."  Minute Order (Oct. 2, 2019).  Following an October production, GSA represented that it would review and produce, as appropriate, all remaining documents by December 2, 2019.  ECF No. 31.  GSA again missed the deadline, requiring the Court to set a new production deadline of January 10, 2020, *see* Minute Order (Dec. 16, 2019), which GSA met.  In total, GSA produced 13 pages as a result of its supplemental search.  CREW Ex. 8–10; Lewis Decl. ¶ 15.  Twelve of the 13 pages were redacted pursuant to Exemptions 5 and 6.  *See* CREW Ex. 8–10.  The final page was released in full.  Lewis Decl. ¶ 15.

---

[2] In an update filed with the Court on October 3, 2019, the parties clarified that the supplemental search included communications with eight EOP employees.  ECF No. 30.

GSA has renewed its motion for summary judgment, ECF Nos. 36, 36-1 ("Mot."), and CREW now cross-moves for summary judgment.  At issue is the adequacy of GSA's supplemental search as well as the validity of the exemptions GSA claimed to withhold 27 pages and redact 37 pages of responsive documents.

## ARGUMENT

### I.    GSA Failed to Conduct an Adequate Search for All Responsive Records

#### A.    The Agency Did Not Conduct the Search Agreed Upon by the Parties

To obtain summary judgment, "the agency must demonstrate that it has conducted a 'search reasonably calculated to uncover all relevant documents.'"  *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  The agency can carry this burden through declarations denoting "which files were searched" and "reflect[ing] a systematic approach to document location."  *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (citing *Weisberg v. DOJ*, 627 F.2d 365, 271 (D.C. Cir. 1980)).  If "the record raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials,' summary judgment" for the agency "is inappropriate."  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (citation omitted).  In addition, "where sophisticated parties to a FOIA case have agreed to narrow the issues in a written status report, they generally may be held to their agreement under traditional waiver principles."  *Am. Ctr. for Law & Justice v. DOJ*, 325 F. Supp. 3d 162, 168 (D.D.C. 2018).  Whether a particular search is adequate ultimately depends on "the circumstances of the case."  *Davis v. DOJ*, 460 F.3d 92, 103 (D.C. Cir. 2006) (citation omitted).

Here, the inadequacy of GSA's search is clear from the agency's failure to conduct the search agreed upon by the parties.  In the September 9, 2019 joint status report, which GSA's counsel filed with the Court, "the parties agree[d] that the search terms to be used to locate responsive materials" within the set of potentially responsive records would be "any of the

following terms: 'FBI', 'Federal Bureau of Investigation', 'Hoover', 'JEH', 'Wray',

'Rosenstein', or 'Deputy AG.'"  ECF No. 27 at 2.  The Court acknowledged the parties'

agreement in its September 9, 2019 order setting the deadline for production.  *See* Minute Order

(Sept. 9, 2019).  Yet GSA apparently disregarded the parties' agreement and its own

representations to the Court.  Rather than use the agreed-upon terms, Mr. Lewis's declaration

states that GSA located potentially responsive records using just two terms: "EPW" and

"FBI."[3]  Lewis Decl. ¶ 13.  Although the Lewis declaration claims that GSA's "search

parameters were communicated to the Plaintiff and no objection was received," Lewis Decl.

¶ 14, that is patently false.  CREW has no record of GSA ever proposing to use only "EPW" and

"FBI" as search terms, Declaration of Nikhel S. Sus ¶¶ 3–4, and certainly would have objected to

such a proposal as inconsistent with the parties' joint status report and its more inclusive set of

terms.  Apart from this misstatement, GSA offers no explanation for abandoning the parties'

agreement.

   GSA's incorrect claim about its search term proposal is not the only factual inaccuracy in

the Lewis declaration.  For example, the declaration claims that CREW brought the House

Oversight emails to GSA's attention after the completion of GSA's initial searches and

production of 25 pages.  *See* Lewis Decl. ¶ 12.  However, the record makes clear that CREW

identified the House Oversight emails to GSA before GSA conducted the search that became the

subject of the parties' first cross-motions for summary judgment.  *See* GSA Ex. 2 at 2 [ECF No.

36-5] (October 18, 2018 email exchange between CREW and GSA counsel discussing House

---

[3] "EPW" appears to be a reference to the U.S. Senate's Committee on Environment and Public
Works, which sent GSA Questions for the Record about the FBI headquarters project.  *See*
*Vaughn* Index at 5 (describing withheld document).  The term "EPW" also appears in an email
released by House Oversight that is responsive to Plaintiff's FOIA request.  *See* CREW Ex. 3 at
2281; *see also* Op. at 9–11 (describing email released by House Oversight as responsive).

Oversight emails); ECF No. 22 at PDF 18, ¶¶ 9–11 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts, First Summary Judgment Briefing).  Indeed, the Court's holding that GSA's prior search was inadequate recognized that "this is not a case where Defendant uncovered additional documents *after* its initial search" but rather "Plaintiff presented Defendant with documents responsive to its FOIA request *prior* to Defendant's supplemental search."  Op. at 11 (emphasis in original) (quotation marks omitted).  Given the multiple inaccuracies, the Court should view the Lewis declaration with skepticism.

Moreover, the Lewis declaration lacks clarity with respect to another part of the parties' agreement on search parameters.  GSA represented in the September 9, 2019 joint status report that it had searched "all agency communications" with specified EOP employees.  *See* ECF No. 27 at 1.  The language of the Lewis declaration is unclear, however, on whether and how this was done.  The Lewis declaration indicates that the EOP employees' full names, with middle initials, were used as search terms.  *See* Lewis Decl. ¶ 13.  If the declaration accurately explains GSA's search, that would again deviate from the joint status report because those terms would not identify "all agency communications" with the EOP employees.  For instance, those terms would seem to exclude emails in which the EOP employees' names were written as "Last Name, First Name, Middle Initial" and emails in which only the EOP employees' email addresses (and not their names) appeared.  GSA fails to explain how the search it conducted meets the terms set forth in the joint status report.

GSA's inexplicable failure to follow the parties' agreement renders its search inadequate. The Court made clear the legal significance of joint status reports earlier in this litigation.  Op. at 8–9 (analyzing case law).  In its prior opinion, the Court held that CREW's initial proposal of search terms and parameters did not narrow its FOIA request, noting "there were no joint status

reports evidencing an agreement to Plaintiff's FOIA request" and "the parties never agreed to narrow the issues in a written status report filed with the Court." *Id.* Following the Court's ruling, the parties came to an agreement on supplemental search terms and filed a joint status report apprising the Court of their agreement. ECF No. 27. GSA, as a sophisticated responder to FOIA requests that was recently educated on the significance of memorializing agreements in joint status reports, should be "held to [its] agreement." *Am. Ctr. for Law & Justice*, 325 F. Supp. 3d at 168. The Court should hold GSA's search inadequate.

**B.** **GSA Used Unreasonably Narrow Search Terms that Failed to Locate Emails Released by House Oversight**

Even if GSA were not bound by its agreement in the September 9, 2019 joint status report, CREW would be entitled to summary judgment on this issue. GSA's under-inclusive search terms—"EPW" and "FBI"—fall short of the "standard of reasonableness" the agency must meet. *Coffey v. Bureau of Land Mgmt.*, 249 F. Supp. 3d 488, 498 (D.D.C. 2017). Although CREW's FOIA request sought "all communications from January 20, 2017 to [July 30, 2018] between GSA and the White House concerning the renovation of the FBI headquarters," GSA Ex. 1, GSA's two terms would not have captured documents referring to the FBI headquarters by any name other than one containing "FBI." GSA's search would not locate, for example, communications that used "Federal Bureau of Investigation" instead of the acronym "FBI," or communications discussing the current headquarters location, the J. Edgar Hoover Building. Under such circumstances, GSA's search was not "reasonably calculated to uncover all relevant documents." *See Weisberg*, 745 F.2d at 1485 (citation omitted).

Judges in this district have already rejected similar terms as unreasonable in the context of FOIA requests related to the FBI headquarters consolidation project. *See CREW v. GSA*, No. 18-CV-377 (CRC), 2018 WL 6605862, at *5–6 (D.D.C. Dec. 17, 2018); *Am. Oversight v. Office*

*of Mgmt. & Budget*, No. 18-CV-2424 (DLF), 2020 WL 1536186, at *4–5 (D.D.C. Mar. 31,

2020).  As Judge Cooper explained, it is "rather likely that 'JEH' and 'the Hoover Building'—

referring to the current headquarters—would be used in communications and records regarding

the headquarters consolidation project."  *CREW*, 2018 WL 6605862, at *5.  Thus, Judge Cooper

held, adequate searches "ought to include these rather obvious synonyms" for the FBI

headquarters.  *Id.* (holding GSA's search inadequate when it used the terms "FBI"; "FBI

Headquarters"; "FBI Headquarters procurement"; "Mary Gilbert and Tim Horne and eop.gov";

"Mary Gilbert and Tim Horne and fbi.gov"; "Mary Gilbert and Tim Horne and omb.gov"; and

"procurement for the new FBI Headquarters consolidation"); *see also Am. Oversight*, 2020 WL

1536186, at *4 (finding OMB conducted an inadequate search when it used the terms "FBI

headquarters consolidation project"; "FBI HQ"; "FBI" within 25 words of "headquarters"; or

"HQ" within 25 words of "project," "renovation," "relocation," or "Trump").  Here, GSA's

refusal to use the same "rather obvious synonyms" renders its search inadequate.  *See Am.*

*Oversight*, 2020 WL 1536186, at *4 ("As a general matter, omitting from the search an

alternative name by which the subject of the search is known renders the search

inadequate." (quotation marks and citation omitted)).

     Moreover, GSA's search did not locate one of the emails released by House Oversight—

even though this Court's prior opinion specifically faulted GSA for not locating the record.[4]  Op.

at 10–11.  In the missing email exchange, dated January 28, 2018, GSA officials forwarded an

email from an OMB official (from an EOP email address), and explained that the FBI

headquarters project was now "a demolition/new construction [project] per the President's

---

[4] GSA did locate and produce the other email identified in the Court's prior opinion as
responsive.  *See* Op. at 9–11 (analyzing House Oversight emails).

instructions."  CREW Ex. 3 at 2290–91.  The email also indicated that GSA and OMB

exchanged a slide deck entitled "FBI pres feedback."  *Id.*  In its prior opinion, the Court noted

that "[a]n adequate search for emails between any GSA email address and any White House *or*

EOP email address would presumably have discovered the January 28, 2018 email."  Op. at 10

(emphasis in original).  Yet GSA still has not produced, or identified in its *Vaughn* index, this

email.  *See generally Vaughn* Index [ECF No. 36-6].  Nor has GSA produced or identified any

other emails from GSA and OMB about the "FBI pres feedback" slide deck.  GSA's failure to

locate these records casts serious doubt on the adequacy of its search, and leaves the same

"positive indications of overlooked materials" that proved dispositive in the first round of

summary judgment briefing.  *See* Op. at 11–12 ("The fact that Defendant's search failed to yield

responsive records, which Defendant knew existed prior to conducting its search, casts

substantial doubt on the adequacy of Defendant's search."); *Valencia-Lucena*, 180 F.3d at 327

("[W]hat causes us to conclude that the search was inadequate arises from the fact that the record

itself reveals 'positive indications of overlooked materials.'").

      GSA offers no justification for its failure to use "obvious synonyms" like "JEH" and

"Hoover"—which it initially agreed to in the September 9, 2019 written status report—or its

failure to locate the House Oversight email.  This lack of explanation, too, renders GSA's

response insufficient.  *See Am. Oversight*, 2020 WL 1536186, at *5 (finding insufficient OMB's

justification as to why it refused to use terms offered by the FOIA requestor); *Am. Ctr. for*

*Equitable Treatment, Inc. v. Office of Mgmt. & Budget*, 281 F. Supp. 3d 144, 152 (D.D.C. 2017)

("[W]here, as here, a FOIA requester suggests search terms that are common in practice, but the

agency elects not to use them, the failure of the agency to explain its choices prevents the court

from evaluating the reasonableness of the agency's search method.").

In sum, GSA ignored the parties' agreed-upon search terms; conducted an under-inclusive search that failed to yield a previously-identified House Oversight email or any related documents; and provided no explanation for its actions. Such efforts are deficient as a matter of law. *See Friends of Blackwater v. U.S. Dep't of Interior*, 391 F. Supp. 2d 115, 121 (D.D.C. 2005) (granting plaintiff summary judgment where agency "fail[ed] to produce documents known to have originated" in a particular bureau of the agency, which "cast[] 'substantial doubt' on the sufficiency of the search of that office"); *Boyd v. U.S. Marshals Serv.*, No. 99-2712, 2002 U.S. Dist. LEXIS 27734, at *2–3 (D.D.C. Mar. 15, 2002) (denying agency summary judgment where it failed to explain why its search did not identify a particular report known to exist).

## II.   GSA Is Improperly Withholding Material under FOIA Exemptions 5 and 7(E)

FOIA "mandates that an agency disclose records on request, unless they fall within one of nine exemptions. These exemptions are 'explicitly made exclusive,' and must be 'narrowly construed.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citations omitted). "[T]he burden is on the agency to show that requested material falls within a FOIA exemption." *Burka v. HHS*, 87 F.3d 508, 514 (D.C. Cir. 1996) (quotation marks and citation omitted). "To enable the Court to determine whether documents properly were withheld, the agency must provide a detailed description of the information withheld through the submission of a so-called '*Vaughn* index,' sufficiently detailed affidavits or declarations, or both." *Hussain v. DHS*, 674 F. Supp. 2d 260, 267 (D.D.C. 2009) (citing, among others, *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973)); *see also Judicial Watch, Inc. v. FDA ("Judicial Watch I")*, 449 F.3d 141, 146 (D.C. Cir. 2006). Although there is no set formula for a *Vaughn* index, the agency must "disclos[e] as much information as possible without thwarting the exemption's purpose." *King v. DOJ*, 830 F.2d 210, 224 (D.C. Cir. 1987). "Because of FOIA's critical role in promoting transparency and accountability, '[a]t all times courts must bear in mind that FOIA mandates a strong presumption

in favor of disclosure.'" *Rosenberg v. DOD*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018) (quoting

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)) (brackets in original).

In 2016, Congress amended FOIA through the FOIA Improvement Act, Pub. L. No. 114-

185, 130 Stat. 538.  Those amendments "codified the 'foreseeable harm' standard established by

the Department of Justice in 2009 and used to defend an agency's decision to withhold

information." *Judicial Watch, Inc. v. U.S. Dep't of Commerce ("Judicial Watch II")*, 375 F.

Supp. 3d 93, 98 (D.D.C. 2019) (citing S. Rep. No. 114-4, at 3 & n.8, 7–8 (2015)).  As amended,

the statute now provides: "An agency shall . . . withhold information under this section only if

. . . (I) the agency reasonably foresees that disclosure would harm an interest protected by [a

FOIA] exemption . . .; or (II) disclosure is prohibited by law."  5 U.S.C.

§ 552(a)(8)(A)(i).  "Stated differently, 'pursuant to the FOIA Improvement Act, an agency must

release a record—even if it falls within a FOIA exemption—if releasing the record would not

reasonably harm an exemption-protected interest' and if the law does not prohibit the

disclosure." *Judicial Watch II*, 375 F. Supp. 3d at 98 (quoting *Rosenberg*, 342 F. Supp. 3d at

72).  "[T]he foreseeable-harm requirement impose[s] an independent and meaningful burden on

agencies," which is "intended to restrict agencies' discretion in withholding documents under

FOIA."  *Ctr. for Investigative Reporting v. CBP*, No. 18-2901 (BAH), 2019 WL 7372663, at *9

(D.D.C. Dec. 31, 2019) (quotation marks and citation omitted) (second bracket in original).  To

satisfy "this independent and meaningful burden, an agency must 'identify specific harms to the

relevant protected interests that it can reasonably foresee would actually ensue from disclosure of

the withheld materials' and 'connect[] the harms in [a] meaningful way to the information

withheld.'"  *Id.* (quoting *Judicial Watch, Inc. v. DOJ*, No. 17-0832 (CKK), 2019 WL 4644029, at

*5 (D.D.C. Sept. 24, 2019)) (brackets in original).

Here, GSA has fallen far short of its burden to justify its withholdings under FOIA Exemptions 5 and 7(E).[5]

### A.      Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Thus, "Exemption 5 permits an agency to withhold materials normally privileged from discovery in civil litigation against the agency."  *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997).  To fit into Exemption 5, "a document must meet two conditions: 'its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it.'"  *Stolt-Nielsen Transp. Grp. v. United States*, 534 F.3d 728, 733 (D.C. Cir. 2008) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)).  In addition, as outlined above, an agency invoking Exemption 5 must satisfy the "foreseeable harm" standard codified at 5 U.S.C. § 552(a)(8)(A)(i).

In support of its Exemption 5 claims, GSA has asserted a combination of three privileges—the presidential communications privilege, the deliberative process privilege, and the work-product doctrine—as to five categories of documents:

1.      Email communications from January 20, 2017 to July 30, 2018, between GSA and the White House concerning the renovation of FBI Headquarters (presidential communications and deliberative process privileges) ("**Category No. 1**");

2.      A draft copy of GSA's responses to Questions for the Record from the U.S. Senate's Committee on Environment and Public Works regarding the FBI Headquarters Project sent between White House Counsel and GSA's Office of General Counsel (deliberative process privilege) ("**Category No. 2**");

---

[5] CREW is not challenging GSA's application of FOIA Exemptions 6 or 7(C), which the agency relied upon to redact email addresses and cellular phone numbers of agency and White House employees as well as the name of a particular agency employee.  *See* Lewis Decl. ¶ 16; *Vaughn* Index at 1, 3; Mot. at 16 n.5.

3.  A draft copy of GSA's Office of the Inspector General's Draft Review of GSA's Revised Plan for the FBI Headquarters Consolidation Project sent between White House Counsel and GSA's Office of General Counsel (deliberative process privilege) ("**Category No. 3**");

4.  A draft copy of correspondence from GSA's General Counsel to GSA IG's Counsel to the Inspector General concerning a records request for the FBI Headquarters Project (deliberative process privilege and attorney work product doctrine) ("**Category No. 4**"); and

5.  A White House Briefing Itinerary regarding a discussion of the future of the FBI headquarters on January 24, 2018 (presidential communications privilege) ("**Category No. 5**").

*See* Mot. at 7; *Vaughn* Index at 2, 5–8.  GSA's Exemption 5 claims fail for multiple reasons.

### 1.  GSA Fails to Satisfy the Foreseeable Harm Standard as to Each of Its Exemption 5 Withholdings

GSA fails to satisfy FOIA's foreseeable harm standard as to each of its Exemption 5 withholdings.  To begin, GSA does not even attempt to meet its burden to "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld" with respect to the White House Briefing Itinerary (Category No. 5).  *See Judicial Watch II*, 375 F. Supp. 3d at 100 (quoting H.R. Rep. No. 114-391 at 9).  GSA's *Vaughn* index says only that "[t]his document is a communication prepared by presidential advisers in the course of preparing advice for the President regarding the future of the FBI Headquarters project."  *Vaughn* Index at 8.  Because GSA has failed to offer any claim of foreseeable harm, GSA's Exemption 5 claim as to the White House Briefing Itinerary should be summarily rejected.

GSA's remaining Exemption 5 claims fare no better.  Each of the other Exemption 5 entries in the *Vaughn* index recites slight variations of the same sentence to justify withholding: "Disclosure would also have a chilling effect on the ability of GSA to engage in either

interagency and intra-agency discussions candidly about matters of policy and agency action without concern that the information could be disclosed prior to its occurrence." *Vaughn* Index at 2, 5–7 (Category Nos. 1–4). GSA also claims that release of the draft documents (Category Nos. 2–4) would "reveal the editorial judgments of government staff and collaborative dialogue about agency personnel's decisions about which portions to retain and revise" while release of the email communications (Category No. 1) would reveal the "collaborative dialogue about agency personnel's decisions about which portions to retain and revise." *Id.*

Although these descriptions at least attempt to show foreseeable harm, the agency's perfunctory claim that disclosure would reveal "collaborative dialogue" and "would have a chilling effect" on GSA's ability to "engage in either interagency and intra-agency discussions about matters of policy and agency action without concern that said information could be disclosed prior its []occurrence" is plainly insufficient. Judges of this court have repeatedly rejected similar "boiler plate language." *Judicial Watch II*, 375 F. Supp. 3d at 100–01 (declaration failed to demonstrate foreseeable harm in connection with deliberative process claim where it merely stated that "release of the redacted material would have the foreseeable harm of discouraging a frank and open dialogue among interagency staff"); *Rosenberg*, 342 F. Supp. 3d at 79 (same, where declaration "perfunctorily state[d] that disclosure of all the withheld information . . . 'would jeopardize the free exchange of information between senior leaders within and outside of the [DOD]'" (second brackets in original)); *Ctr. for Investigative Reporting*, 2019 WL 7372663, at *9 (same, where *Vaughn* index included the same three sentences with every Exemption 5 claim, stating that disclosure "could result in confusion" and "chill open and frank discussions"). "If the mere possibility that disclosure discourages a frank and open dialogue was enough for the exemption to apply, then Exemption 5 would apply

whenever the deliberative process privilege was invoked regardless of whether disclosure of the information would harm an interest protected by the exemption." *Judicial Watch II*, 375 F. Supp. 3d at 101.  That was not what Congress intended in codifying the "heightened standard" of foreseeable harm.  *Ctr. for Investigative Reporting*, 2019 WL 7372663, at *4, *9 (noting "Congress's concern about agencies' over-withholding under Exemption 5").  GSA's Exemption 5 claims should therefore be rejected.

Moreover, GSA's conclusory claims of harm are undermined by reviewing the Category No. 1 emails.  Because of the emails released by House Oversight, as well as inconsistent redactions by GSA, it is possible to see in full the text withheld from Category No. 1 under Exemption 5.  For example, House Oversight published an unredacted email exchange between Joseph Lai of the White House and Brennan Hart of GSA concerning the "path forward for the new FBI Headquarters announcement," which the "President" had "signed off on":

On Jan 25, 2018, at 2:48 PM, Brennan Hart - S ███████████ wrote:

Joe-
I wanted to give you a heads up that we will be sending a report to EPW Monday (pending OMB clearance) outlining a path forward for the new FBI Headquarters announcement.  There will also be a hearing on this report February 14.
There is a lot of political interest in this project with the potential of it moving to either Maryland or Virginia.  The President was briefed yesterday on this by the GSA Administrator, Deputy AG and FBI Director and signed off on this path forward.
Let me know if you have any questions.
PBH

CREW Ex. 3 at 2281.  When GSA produced this email in January 2020, it withheld certain information pursuant to Exemption 5:

On Jan 25, 2018, at 2:48 PM, Brennan Hart - S <brennan.hart@gsa.gov> wrote:

Joe-

I wanted to give you a heads up that we will be sending a report to EPW Monday (b) (5) ████████ outlining a path forward for the new FBI Headquarters announcement.  There will also be a hearing on this report February 14.

(b) (5) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Let me know if you have any questions.

PBH

CREW Ex. 10 at 7, 9.[6]

Comparing the redactions to the published email, it is unclear how the withheld information could risk foreseeable harm to GSA's deliberative process.  GSA has offered no clarity on the "specific decision-making processes or deliberations" that would be harmed by the information's disclosure, *Ctr. for Investigative Reporting*, 2019 WL 7372663, at *10, and the email itself indicates that the final decision had already been made with respect to the FBI headquarters, *see* Dep't of Justice, OIP Guidance: Applying the "Foreseeable Harm" Standard under Exemption Five (Jan. 1, 1994), https://bit.ly/2UWTHAY (explaining that when "decisions [are] already made" there is "far less likelihood" of "harm from disclosure").  Further, GSA does not describe how the disclosure of OMB's engagement in the FBI headquarters project or the bare fact of the President's meeting with GSA and FBI officials—both of which are discussed in the public GSA OIG Report, *see* CREW Ex. 2 at 7–10—"would have a chilling effect" on GSA's ability to engage in substantive policy discussions.  The clear lack of foreseeable harm from the

---

[6] In this litigation, GSA actually produced this email with two different sets of redactions.  In its October 2019 production (not mentioned in the agency's *Vaughn* index), GSA did not redact the phrase "(pending OMB clearance)" but did redact "outlining a path forward for the new FBI Headquarters announcement."  CREW Ex. 8 at 5.  Because GSA does not attempt to defend the redactions from the October 2019 production, CREW focuses on the January 2020 redactions.

disclosure of the text in Category No. 1 is fatal to those withholdings, and also undermines

GSA's boilerplate claims of foreseeable harm with respect to its other withholdings.

Because GSA has failed to provide sufficient detail to establish that "it is reasonably

foreseeable that" disclosure of Category Nos. 1–5 "would have a chilling effect," and failed to

specify any "link between this harm and the specific information contained in the material

withheld," *Judicial Watch II*, 375 F. Supp. 3d at 101, it has not satisfied FOIA's foreseeable

harm standard as to these documents.  Each of GSA's Exemption 5 claims should therefore be

rejected.

### 2. The Presidential Communications Privilege Does Not Apply to the Email Communications or the Briefing Itinerary

The presidential communications privilege "applies to communications made in the

process of arriving at presidential decisions." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir.

1997).  The privilege only protects "communications directly involving and documents actually

viewed by the President," and "documents 'solicited and received' by the President or his

immediate White House advisers."  *Judicial Watch, Inc. v. DOJ ("Judicial Watch III")*, 365 F.3d

1108, 1114 (D.C. Cir. 2004).  For the presidential communications privilege to attach to

advisors, those advisors must have "broad and significant responsibility for investigating and

formulating the advice to be given the President."  *Id.* (quoting *In re Sealed Case*, 121 F.3d at

752).  The withheld documents must also "reflect *presidential* decisionmaking and

deliberations," with a clear connection to "presidential powers and responsibilities."  *In re Sealed

Case*, 121 F.3d at 752–53 (emphasis added); *see also Prop. of the People, Inc. v. Office of Mgmt.

& Budget*, 330 F. Supp. 3d 373, 389 (D.D.C. 2018).  Ultimately, "the presidential

communications privilege should be construed as narrowly as is consistent with ensuring that the

confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d at 752.

GSA invokes the privilege as to two categories of document: (1) part of the January 25, 2018 email correspondence between Mr. Hart and Mr. Lai indicating that the President "signed off on" the path forward for the FBI headquarters after meeting with GSA on January 24, 2018, and (2) a one-page "Briefing Itinerary" sent by a White House employee to various GSA officials in advance of a January 24, 2018 meeting at the White House concerning the FBI headquarters project. *See Vaughn* Index at 2, 8; CREW Ex. 1 at 22–25 (attaching Briefing Itinerary); CREW Ex. 10 at 7, 9 (redacted emails). GSA's justification is the same for both withholdings: the information in each document is purportedly "a communication prepared by presidential advisers in the course of preparing advice for the President regarding the future of the FBI Headquarters project." *Vaughn* Index at 2, 8. This cursory explanation fails to sustain GSA's privilege claims for several reasons.

First, GSA has not shown that the withheld itinerary or email communications relate in any way to *presidential* decision-making, and GSA has—outside of this litigation—vigorously disputed that conclusion. In its comments responding to the GSA OIG Report, GSA contested the OIG's suggestion that "the GSA/FBI project team was directed to shift planning efforts from other preferred site options at the behest of senior White House officials," claiming that "[t]his simply is not true." CREW Ex. 2 at A-2. With respect to the January 24, 2018 White House meeting referenced in the email and that is the subject of the withheld itinerary, GSA insisted that "[t]he GSA and FBI representatives attending the January 24 White House meetings had already agreed and decided to locate the new headquarters at 935 Pennsylvania Avenue NW in Washington, DC," and the "*claim that GSA and FBI 'received direction from the President' at*

*the January 24 meeting is unsubstantiated and conclusory*." *Id.* at A-3 (emphasis added)
(citation omitted).

Consistent with GSA's position that the January 24, 2018 meeting entailed no "decision"
that could be "attribute[d] . . . to the President," *id.*, GSA's *Vaughn* index here does not identify
any presidential decision-making process to which the withheld itinerary or email
communication relate. It instead states only that both generally concern "advice for the President
regarding the future of the FBI Headquarters project." *Vaughn* Index at 2, 8. This description is
insufficient to establish the presidential communications privilege, particularly given GSA's
prior statements explicitly disputing that the meeting entailed any presidential decision-
making. *See Prop. of the People*, 330 F. Supp. 3d at 389–90 (denying summary judgment on
presidential communications privilege claim where OMB "offer[ed] no indication of the
presidential powers at issue," and no support for "its contention that the redacted entries relate to
presidential decisionmaking"); *cf. In re Sealed Case*, 121 F.3d at 752–53 (privilege established
where "the documents in question were generated in the course of advising the President in the
exercise of his appointment and removal power, a quintessential and nondelegable Presidential
power," as this provided "assurance" that the documents were "intimately connected to . . .
presidential decisionmaking").[7]

Second, GSA has failed to show that the documents at issue were "documents 'solicited
and received' by the President or his immediate White House advisers who have 'broad and

---

[7] CREW does not concede, as a factual matter, GSA's position that President Trump had no
involvement in the decision-making process concerning the FBI headquarters, but CREW's own
position on this issue is irrelevant for purposes of evaluating GSA's privilege claim. Because
GSA carries the burden of establishing the privilege, it must provide facts demonstrating that the
withheld communications relate to presidential decision-making. It has failed to do so, and thus
its privilege claim should be rejected.

significant responsibility for investigating and formulating the advice to be given the President.'" *Judicial Watch III*, 365 F.3d at 1114.  GSA provides no details on the role of the White House staff who prepared the briefing itinerary.  *See Vaughn* Index at 8.  There is thus no basis to evaluate whether those staff qualify as immediate presidential advisors or had "an actual advisory relationship [with] the President . . . as to that specific document."  *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 26–27, 29 (D.D.C. 2013); *see also Judicial Watch III*, 365 F.3d at 1116 (noting the presidential communications privilege does not cover "every person who plays a role in the development of presidential advice, no matter how remote and removed from the President").  Similarly, with respect to the email exchange between Mr. Hart and Mr. Lai, GSA provides no details about the role of Mr. Lai, and the presidential communications privilege does not generally apply to members of the executive branch who work outside of the White House like Mr. Hart.  *See Ctr. for Effective Gov't*, 7 F. Supp. 3d 16 at 23, 27 n.10.

Third, examining unredacted portions of the email exchange proves that GSA is overreaching with its invocation of this privilege.  The House Oversight release discussed above, which overlaps with the withheld email exchange, indicates that GSA withheld the following information based on its claim of presidential communications privilege: "There is a lot of political interest in this project with the potential of it moving to either Maryland or Virginia.  The President was briefed yesterday on this by the GSA Administrator, Deputy AG and FBI Director and signed off on this path forward."  CREW Ex. 3 at 2281.  It is unclear how GSA's withholding could possibly be "necessary to protect the confidentiality of communications as between the President and his advisors."  *Am. Ctr. for Law & Justice v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 308 (D.D.C. 2018) (quoting *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 25).  Not

only is the fact of the President's meeting public knowledge in light of the GSA OIG Report, the withheld information does not reveal any "candid, objective, and even blunt or harsh opinions" regarding a presidential decision. *Judicial Watch III*, 365 F.3d at 1115; *cf. Prop. of the People*, 330 F. Supp. 3d at 390 ("[T]he mere fact of communications between the OMB Director and White House staff or agency staff on matters of policy is insufficient to show that [the withheld documents] concern matters of presidential decisionmaking."). The purpose of the privilege is clearly not served by GSA's withholding of the Hart-Lai email exchange, which undermines GSA's withholding of the briefing itinerary based on the same verbatim justification.

For all these reasons, the presidential communications privilege does not apply to the January 24, 2018 briefing itinerary or the email exchange between Mr. Lai and Mr. Hart.

> **3. The Deliberative Process Privilege Does Not Apply to the Email Communications or Draft Documents**

To be protected by the deliberative process privilege, a document must be both "predecisional" and "deliberative." *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). A document is predecisional if "it was generated before the adoption of an agency policy." *Judicial Watch I*, 449 F.3d at 151. Deliberative material "reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). But even if a "draft" version of a document is "predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue." *Id.*; *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975).

With respect to the redactions in Category No. 1, another examination of the unredacted emails released by House Oversight demonstrates the deficiencies in GSA's deliberative process privilege claim. From the January 25, 2018 email exchange between Mr. Hart and Mr. Lai, after Mr. Hart noted that Congress would be holding a hearing about the FBI headquarters project,

GSA withheld the following text:  "There is a lot of political interest in this project with the potential of it moving to either Maryland or Virginia.  The President was briefed yesterday on this by the GSA Administrator, Deputy AG and FBI Director and signed off on this path forward."  *Compare* CREW Ex. 3 at 2281, *with* CREW Ex. 10 at 7, 9.  GSA also withheld that the agency would be sending a report to Congress "(pending OMB clearance)."  *Id.*  It is unclear how the withheld information reflects "recommendations so that decisions about the future of the project could be made" or "deliberations through which policy about the project was being formulated," as the *Vaughn* index claims.  *Vaughn* Index at 2.  Rather, the withheld information appears factual and primarily related to an already-made decision on how to proceed with the FBI headquarters project.  But "[t]he deliberative process privilege does not shield documents that simply state or explain a decision the government has already made."  *In re Sealed Case*, 121 F.3d at 737; *see also Public Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 876 (D.C. Cir. 2010) ("Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld.").  Because "[n]othing in the redacted portions of the document[] reflect anything that can even be construed as a personal opinion of an agency official . . . [t]here is . . . no risk that disclosure would cause the agency's decisionmakers to 'temper candor' in their remarks."  *Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336, 353 (D.D.C. 2018) (quoting *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014)).  GSA's deliberative process claim for the emails in Category No. 1 accordingly fails.

As to Category No. 3, GSA appears to assert that it is per se predecisional because it is an "initial draft" of the GSA OIG Report that the OIG shared with GSA for review and comment prior to issuance of the final report in August 2018.  *Vaughn* Index at 6.  But this Circuit has long rejected the view that "any document identified as a 'draft' is per se exempt," so the mere

"designation of . . . documents . . . as 'drafts' does not end the inquiry." *Arthur Andersen & Co.*

*v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982).  Here, there are strong indications that much of the

draft report was ultimately "adopted" in the final report, which would defeat a deliberative

process claim.  *See, e.g.*, CREW Ex. 2 at 2 (noting that "[n]one of" GSA's "revisions" to the

draft report "affected [the OIG's] report conclusions"); *id*. at 21 ("After reviewing a draft of this

report, [GSA Administrator] Murphy requested that we remove all discussion of her testimony

from our report. . . . We disagree and believe the congressman's questions speak for themselves,

as do Murphy's answers at the hearing. . . . In the alternative, Murphy requested that we delete

our finding about her testimony and replace it with language she requested for inclusion in the

report. . . . [W]e cannot do so.").  Because GSA has failed to demonstrate that withheld material

in the draft report was not ultimately adopted in the final report, and because there is evidence

showing otherwise, the Court should reject GSA's deliberative process claim as to the draft

report.  *See Wilderness Soc. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004)

(rejecting deliberative process claim where "the defendants have not indicated whether its

designated 'draft' documents, many of which are public relations materials, have been formally

or informally adopted or used in the agency's interactions with the public"); *Judicial Watch, Inc.*

*v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 261 (D.D.C. 2004) (noting "drafts are not

presumptively privileged" and rejecting deliberative process claim where agency failed to

indicate whether the draft documents were adopted as the agency position).

The same analysis applies to Category No. 2, the "draft copy of GSA's responses to

Questions for the Record" from a Senate committee.  *Vaughn* Index at 5.  This is yet another

draft of a document that was eventually released outside the agency; to the extent the draft

contains material that was adopted in the final version of the responses, it is not exempt.  *See*

*also infra* Part III (asserting that GSA must segregate and release non-exempt portions of documents).

### 4.    GSA Fails to Justify Its Application of the Attorney Work Product Privilege

Exemption 5 also incorporates the attorney work product privilege, which protects from disclosure an attorney's "mental processes." *Klamath Water Users Protective Ass'n*, 532 U.S. at 8.  The work product doctrine thus "shields materials 'prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative.'" *Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quoting Fed. R. Civ. P. 26(b)(3)).  "As a usual rule, disclosure of attorney-client or work product confidences to third parties waives the protection of the relevant privileges; however, when the third party is a lawyer whose client shares an overlapping 'common interest' with the primary client, the privileges may remain intact." *In re Lindsey*, 158 F.3d 1263, 1282 (D.C. Cir. 1998).

GSA claims that the attorney work product privilege protects one document, a "draft copy of the correspondence that GSA's General Counsel wrote on behalf of the GSA Administrator to the Office of Inspector General" that "contains the opinions of counsel regarding [a] records request" concerning the FBI headquarters project. *Vaughn* Index at 7.  The document was attached to an email from GSA's acting general counsel to an EOP employee and an individual with DOJ's Office of Legal Counsel ("OLC").  CREW Ex. 1 at 19–21.

GSA's cursory justification fails to sustain its privilege claim for two reasons.  First, GSA does not claim that the document was prepared "in anticipation of litigation."  *See Vaughn* Index at 7; Lewis Decl. ¶¶ 16–17; Mot. at 8.  While GSA need not necessarily identify a specific case to which a document relates in order to invoke the privilege, it still must describe "some articulable claim, likely to lead to litigation." *Judicial Watch, Inc. v. Reno*, 154 F. Supp. 2d 17,

18 (D.D.C. 2001) (quoting *Coastal States Gas Corp.*, 617 F.2d at 865); *see also Shapiro v. DOJ*, 969 F. Supp. 2d 18, 30 (D.D.C. 2013) ("Thus, 'the [work product] privilege has no applicability to documents prepared by lawyers in the ordinary course of business or for other nonlitigation purposes.'" (quoting *In re Sealed Case*, 146 F.3d 881, 887 (D.C. Cir. 1998) (bracket in original))).  "[B]oilerplate" statements that a document was withheld "as an attorney work product" are insufficient to support a work product claim.  *Shapiro*, 969 F. Supp. 2d at 37 (collecting cases).  Second, GSA makes no effort to explain why sending the draft correspondence outside of the agency does not result in a loss of the privilege.  GSA does not claim that it has a "common interest" with the White House or OLC, nor explain what that interest might be.  *See Rashid v. DOJ*, 99-cv-2461-GK, slip op. at 10 (D.D.C. June 12, 2001) ("Upon review of the Vaughn Index, it is clear that Defendant has failed to even *allege* a common interest with the third parties to whom the documents were disclosed, let alone explain with some specificity the nature of the shared interests.  Accordingly, in the absence of an asserted common interest, the Court concludes that the work-product privilege does not apply to these documents.").  Under these circumstances, GSA cannot sustain its application of the attorney work product privilege.

### B.      Exemption 7(E)

To satisfy Exemption 7(E), an agency must show three things: (1) the records were "compiled for law enforcement purposes," (2) the records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions," and (3) "such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E); *see also Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).  GSA fails to establish at least the second and third requirements.

GSA invokes Exemption 7(E) to withhold portions of a June 5, 2018 email "between an Assistant Special Agent within GSA's Office of Inspector General and the Special Assistant to the GSA Administrator regarding the basis of the Inspector General's request to interview the Administrator."[8] *Vaughn* Index at 4; *see* CREW Ex. 1 at 8 (redacted email).  GSA claims that the withheld information reflects "a specific GSA Office of Inspector General investigative goal as part of its technique in conducting a law enforcement investigation regarding an ongoing investigation within the GSA's Office of Inspector General," and "[i]f this information was made publicly available, it would likely cause a current or future subject of the Office of Inspector General investigation to undertake certain actions in order to circumvent the law." *Vaughn* Index at 4.

Here, again, GSA falls far short of its burden.  The agency provides no details on the specific "technique" implicated by the withheld material, let alone does it explain how disclosure would reveal any such technique.  It instead offers only a "near-verbatim recitation of the statutory standard," which is plainly "inadequate." *CREW v. DOJ*, 746 F.3d 1082, 1102 (D.C. Cir. 2014) (agency failed to meet burden where it failed to specify "what procedures are at stake," or "how disclosure . . . could reveal such procedures"); *see also EPIC v. CBP*, 160 F. Supp. 3d 354, 359 (D.D.C. 2016) (denying summary judgment when agency failed to provide the Court "with sufficient detail regarding the law enforcement techniques or procedures the

---

[8] On the produced email, GSA marked the withholding as based on both Exemptions 5 and 7(E). *See* CREW Ex. 1 at 8 (redacted email).  GSA defends only the application of Exemption 7(E) in its *Vaughn* index and renewed motion for summary judgment, *see* Mot. at 17; *Vaughn* Index at 4, and thus abandons any claim to Exemption 5 for this material, *Burka*, 87 F.3d at 514 ("[T]he burden is on the agency to show that requested material falls within a FOIA exemption." (quotation marks and citation omitted)).

defendant seeks to protect").  GSA's showing similarly fails to satisfy the foreseeable harm standard codified at 5 U.S.C. § 552(a)(8)(A)(i).  *See supra* Part II.A.1.

Moreover, GSA's claim that disclosure of the information may cause the "subject of the Office of Inspector General investigation to undertake certain actions in order to circumvent the law" is highly dubious given that the withheld email is itself a communication between the OIG—the investigator—and GSA—the subject of the investigation.  The GSA OIG is not a general law enforcement agency; it is an investigative unit with a narrowly-defined mission focused exclusively on GSA.  *See* GSA Office of Inspector General Overview, *available at* https://www.gsa.gov/about-us/organization/gsa-office-of-inspector-general-overview (last reviewed Feb. 14, 2020).  Consistent with this function, the email in question plainly concerns the OIG's investigation of GSA's handling of the FBI headquarters project and Administrator Murphy's involvement therein, on which the OIG later issued findings in its August 2018 report.  *See* CREW Ex. 1 at 8 ("As part of the Office of Inspector General's review of the GSA's Federal Bureau of Investigation (FBI) Headquarters Consolidation Project, I would like to schedule a time to meet with Administrator Murphy.  [redacted]."); CREW Ex. 2 at 18–22 (GSA OIG Report) (reporting OIG's findings on the accuracy of Administrator Murphy's congressional testimony).  Thus, insofar as the withheld email conveys any of the OIG's secret law enforcement techniques, the OIG—by sending the email to GSA and, specifically, Administrator Murphy's assistant—disclosed those techniques to the very agency and officials it is charged with investigating.  This refutes any notion that the GSA OIG has a law enforcement interest in keeping this information secret.  *See Kubik v. BOP*, No. 10-6078-TC, 2011 WL 2619538, at *11 (D. Or. July 1, 2011) (rejecting Exemption 7(E) claim seeking to prevent

disclosure of guards' "tactical maneuvers" during a prison riot, where those maneuvers were "no

secret to the prison inmates").

### III.     GSA Fails to Demonstrate that It Released All Reasonably Segregable Non-Exempt Material

Finally, GSA has failed to show that it complied with its segregability obligations.  Even

when FOIA exemptions apply, "[a]ny reasonably segregable portion of a record shall be

provided to any person requesting such record after deletion of the portions which are

exempt."  5 U.S.C. § 552(b)(9).  The agency must therefore segregate and release all non-exempt

portions of a document, unless they are "inextricably intertwined with exempt portions."  *Trans-*

*Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999).  And

the agency must provide a "detailed justification," not just "conclusory statements," to prove that

it has released all reasonably segregable information.  *Mead Data Cent., Inc. v. Dep't of Air*

*Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).

As noted, GSA is withholding four documents in full, totaling 27 pages.  *See Vaughn*

Index at 5–8.  The draft GSA OIG report comprises 19 of these pages, which GSA is

withholding pursuant to the deliberative process privilege.  *Id.* at 6.  But even accepting GSA's

claim of privilege, it is highly likely that some portion of this report is non-exempt and

segregable.  Indeed, the final GSA OIG Report contains a significant amount of purely factual

background information, *see* CREW Ex. 2, and "[f]actual material that does not reveal the

deliberative process is not" privileged, *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007)

(citation omitted); *see also Public Emps. for Envtl. Responsibility v. EPA*, 926 F. Supp. 2d 48, 59

(D.D.C. 2013) (ordering agency to segregate and release background sections of report "because

they represent 'purely factual material' that can be severed 'without compromising' the rest of

the report").  Much of this background information is likely included in the draft report, as well.

31

To the extent it is, GSA must segregate and release it. The same is true for the four-page draft GSA responses to a Senate Committee's "Questions for the Record." *Vaughn* Index at 5.  Any purely factual, non-exempt material in this document likewise must be released.  Moreover, as explained *supra* Part II.A.3, GSA must segregate and release any portions of the draft documents that were adopted as final agency positions.

Further, GSA provides no explanation as to why it redacted the titles of the withheld draft documents and briefing itinerary from the email communications to which they were attached. *See* CREW Ex. 1 at 6, 16–23, 25.  There is no entry on the *Vaughn* index explaining these redactions from the email correspondence; the entries for each document withheld in full addresses only the withheld document itself.  *See Vaughn* Index at 5–8.  GSA does not attempt to explain how the titles, standing alone, are exempt under FOIA or whether the titles provide more information about the withheld documents than is already revealed through the descriptions in the *Vaughn* index.  Nor does GSA claim the titles are "inextricably intertwined" with the exempt portions of the withheld documents or the email communications in which the titles appear. Indeed, the subject line of the emails attaching the briefing itinerary are "Fwd: GSA.DOCX," CREW Ex. 1 at 22–25, suggesting that is the title of the withheld document.  If so, it is difficult to see how such a title could not be segregated and released.  Because GSA has made no effort to show that the document titles are either exempt from production or not reasonably segregable, this information must be released.

**CONCLUSION**

The Court should grant CREW's cross-motion for summary judgment and deny GSA's motion.

Date: April 16, 2020                                  Respectfully Submitted,

                                                     */s/ Jessica Lutkenhaus*
                                                     Jessica Lutkenhaus
                                                     (D.C. Bar No. 1046749)
                                                     Nikhel S. Sus
                                                     (D.C. Bar No. 1017937)
                                                     Anne L. Weismann
                                                     (D.C. Bar No. 298190)
                                                     Citizens for Responsibility and Ethics
                                                            in Washington
                                                     1101 K St. NW, Suite 201
                                                     Washington, D.C. 20005
                                                     Telephone: (202) 408-5565
                                                     Fax: (202) 588-5020
                                                     jlutkenhaus@citizensforethics.org
                                                     nsus@citizensforethics.org
                                                     aweissman@citizensforethics.org

                                                     *Counsel for Plaintiff*